# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHARLES R. BLACKBURN, Derivatively on Behalf of JPMORGAN CHASE & CO., | Civil Action No. 1:22-cv-07649 |
| Plaintiff, | **PUBLIC REDACTED VERSION** |
| v. | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| JAMES DIMON, MARIANNE LAKE, LINDA BAMMANN, STEPHEN BURKE, TODD COMBS, JAMES CROWN, TIMOTHY FLYNN, MELLODY HOBSON, LABAN P. JACKSON, and LEE R. RAYMOND, | |
| Defendants, | |
| and | |
| JPMORGAN CHASE & CO., | |
| Nominal Defendant. | |

807161.3

Plaintiff Charles R. Blackburn ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, JPMorgan Chase & Co. ("JPMorgan" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties. Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiff's attorneys, which included the review and analysis of: (a) documents and information obtained pursuant to 8 Del. C. § 220 ("Section 220") (the "220 Demand"); (b) public filings made by JPMorgan and other related parties and non-parties with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (c) press releases and other publications disseminated by the certain of the Defendants (defined herein) and other related non-parties; (d) the pleadings and responsive filings in the related securities class action captioned *In re JPMorgan Chase & Co. Securities Litigation.*, Case No. 1:20-cv-05124-ENV-RML (E.D.N.Y.) (the "Securities Class Action"); and (e) other publicly available information concerning JPMorgan and Defendants.

## I.     NATURE AND SUMMARY OF THE ACTION

1.      JPMorgan is one of the largest investment banks in the United States.

2.      The Company has faced a barrage of criminal prosecutions since defendant James Dimon ("Dimon") became the Company's Chief Executive Officer in 2005. During Dimon's tenure, JPMorgan has admitted to engaging in various criminal activities, each of which presents a red flag for oversight by the Board of Directors (the "Board") of the Company's risk and compliance functions. The illegal spoofing in the precious metals market discussed herein is the latest instance of such criminal financial activity.

3.      These activities have resulted in substantial financial and reputational harm to the Company in addition to potential damages from the Securities Class Action.

4.      Plaintiff did not make a litigation demand prior to filing this action because such a demand would have been futile based upon the composition of the Board and the actions taken by the Board as alleged herein.

## II.     JURISDICTION AND VENUE

5.      This Court has original jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1332(d).  Subject matter jurisdiction is proper because: 1) the amount in controversy in this action exceeds seventy-five thousand dollars, exclusive of interest and cost; and 2) the named Plaintiff and defendants are citizens of different states. 28 U.S.C. § 1332(d)(2)(A).

6.      This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: contribution for violations of Section 10(b) of the Exchange Act.  This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

7.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## III.    PARTIES

**Plaintiff**

8.      Plaintiff Charles R. Blackburn, a Pennsylvania resident currently owns 760 shares of JPMorgan common stock and has continuously owned JPMorgan common stock since June 2008.

**Nominal Defendant**

9.     Nominal Defendant JPMorgan is a Delaware corporation with its principal executive offices located at 383 Madison Avenue, New York, New York. Its common stock trades on the New York Stock Exchange ("NYSE") under the symbol "JPM."

**Defendants**

10.     Defendant Dimon has served as Chairman of the Board since 2007 and as Chief Executive Officer of the Company since December 31, 2005. Dimon is named as a defendant in the Securities Class Action. From 2016-2021 alone, Dimon received compensation of more than $233,000,000 from JPMorgan.  Previously, in 2004, he served as a director of Bank One prior to the merger with Bank One. Dimon is chairman of the board of directors of the Business Roundtable and has had this position since 2009.  He and defendant Burke both graduated Harvard Business School in 1982.  Upon information and belief, Dimon is a citizen of the state of New York.

11.     Defendant Marianne Lake ("Lake") served as the Company's Chief Financial Officer from 2013 to 2019. Lake is currently a member of the Company's Operating Committee and is the Co-CEO of Consumer & Community Banking. Lake is named as a defendant in the Securities Class Action. From 2016-2019, Lake received compensation more than $287,000,000. Upon information and belief, Lake is a citizen of the state of New York.

12.     Defendant Linda Bammann ("Bammann") has served as a director of the Company since 2013. She was Chair of the Risk Committee and a member of the Compensation & Management Development Committee ("Compensation Committee") at all relevant times. She received $405,000 for director compensation in 2021. Since 2016, she has received more than $2.3 million in director compensation.  Bammann was Deputy Head of Risk Management of JPMorgan from 2004 to 2005 and an Executive Vice President and Chief Risk Management Officer at Bank

One Corporation from 2001 to 2004. Upon information and belief, Bammann is a citizen of the state of Florida.

13.     Defendant Stephen Burke ("Burke") has served as a director of the Company since 2004. He is a member of the Compensation and Corporate Governance & Nominating ("Corporate Governance") Committees. He was a member of the FX/Markets Compliance Committee ("Compliance Committee," referenced below) during 2019 and 2020.  Burke received  $452,500 for director compensation in 2021.  Since 2016, he has received more than $2.3 million in director compensation. Burke was a director of Bank One Corporation from 2003-2004 prior to his tenure at JPMorgan.  Among other things, he is a Senior Advisor of Comcast Corporation and a member of the Berkshire Hathaway board of directors since 2009.  He also served as President of Comcast Cable during the merger of Comcast and NBC Universal (owned by General Electric). He and defendant Dimon graduated from Harvard Business School in 1982.  Upon information and belief, Burke is a citizen of the state of New York.

14.     Defendant Todd Combs ("Combs") has served as a director of the Company since 2016.  He is a member of  Compensation and Corporate Governance Committees) at all relevant times.  Combs received substantial compensation as a director.  For example, in 2021 he received $394,755 in director compensation. Since 2016, he has received nearly $2 million in director compensation.  Combs is also an investment officer at Berkshire Hathaway Inc. and President and Chief Executive Officer of Geico. Upon information and belief, Combs is a citizen of the state of Nebraska.

15.     Defendant James Crown ("Crown") has served as a director of the Company since 2004. He was a member of the Risk Policy Committee at all relevant times.  He also is a member of the Public Responsibility Committee. Crown received substantial compensation as a director of

the Company.  For example, in 2021, Crown received $395,000 in director compensation.  Since 2016, he has received more than $2.2 million in director compensation.  Crown was a director of Bank One Corporation from 1991-2004. Crown also sits on the board of General Dynamics Corporation and was a director of Sara Lee Corporation from 1992-2012. Upon information and belief, Crown is a citizen of the state of Illinois.

16.     Defendant Timothy Flynn ("Flynn") has served as a director of the Company since 2012. Flynn is a member of the Audit Committee. Flynn receives substantial compensation as a director of the Company.  In 2021, for example, Flynn received $515,000 in director compensation. Since 2016, he has received more than $2.5 million in director compensation. Flynn was chairman of KPMG from 2007 until his retirement in 2011.  He is a director of United Health Group and Wal-Mart Stores and previously was a member of the board of directors of Chubb Corporation from 2013-2016 (along with former director William Weldon).  Since 2009, he has been a member of the board of directors of the Business Roundtable. Upon information and belief, Flynn is a citizen of the state of Arizona.

17.     Defendant Mellody Hobson ("Hobson") has served as a director of the Company since 2018. She was a member of the Compliance Committee.  She was a member of the Risk Committee at all relevant times. Hobson is also a member of the Public Responsibility Committee. Hobson receives substantial compensation as a director of the Company. In 2021, for example, she received $397,500 in director compensation.  Since joining the board in 2018, she has received more than $1.3 million in director compensation.  Hobson is also a director of Starbucks Corporation. Upon information and belief, Hobson is citizen of the state of Illinois.

18.     Defendant Michael Neal ("Neal") has served as a director of the Company since 2014.  He is a member of the Audit and Public Responsibility Committee. Neal receives substantial

compensation as a director. In 2021, for example, Neal received $380,000 in director compensation. Since 2016, he has received more than $2.2 million in director compensation from JPMorgan.  Neal was vice-chairman of General Electric from 2005-2013.  Upon information and belief, Neal is a citizen of the state of Florida.

19.     Defendant Laban P. Jackson ("Jackson") served as a director of the Company from 2010 to 2020. He was a member of the Compliance Committee. From 2016-2020, Jackson received more than $2.5 million in director compensation  for his service on the JPMorgan board.  He also was a member of the Bank One board of directors from 1993-2004. Upon information and belief, Jackson is a citizen of the state of Michigan.

20.     Defendant Lee R. Raymond ("Raymond") served as a director of the Company from 1987 to 2020.  He was a member of the Compliance Committee. From 2016-2020, Raymond received more than $2.1 million in director compensation.  Upon information and belief, Raymond is a citizen of the state of Texas.


21.     Defendants Dimon, Lake, Bammann, Burke, Combs, Crown, Flynn, Hobson, Neal, Jackson, and Raymond are collectively referred to hereinafter as the "Individual Defendants."

**Current Directors Not Named as Defendants**

22.     Alex Gorsky ("Gorsky") has served as a director of the Company since July 2022.

23.     Phebe Novakovic ("Novakovic") has served as a director of the Company since 2020.

24.     Virginia Rometty ("Rometty") has served as a director of the Company since 2020.

## IV.      DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.      Fiduciary Duties

25.      By reason of their positions as officers, directors, and/or fiduciaries of JPMorgan and because of their ability to control the business and corporate affairs of JPMorgan, at all relevant times, the Individual Defendants owed JPMorgan and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage JPMorgan in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of JPMorgan and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to JPMorgan and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

26.      The Individual Defendants, because of their positions of control and authority as directors and/or officers of JPMorgan, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with JPMorgan, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

27.      To discharge their duties, the officers and directors of JPMorgan were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of JPMorgan were required to, among other things:

> (a)      Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)    Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)    Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d)    When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

**B.    Risk Policy Committee**

28.    The Company's Risk Policy Committee is charged with "[p]rimary responsibility for assisting the Board in its oversight with respect to operating risk, legal risk and compliance rests with the Audit Committee."  According to the charter[1] (adopted March 2013), the Risk Policy Committee oversees management's exercise of its responsibility to: " 1. Assess and manage the Firm's credit risk, market risk, structural interest rate risk, investment risk, liquidity risk, fiduciary risk and model risk" and "2.   Ensure that there is in place an effective system reasonably designed to evaluate and control such risk throughout the Firm."

29.    Among other things, such oversight of JPMorgan's risk appetite requires the Risk Policy Committee to:

17.    Review a report to be submitted periodically by the Chief Risk Officer to the DRPC [Risk Policy Committee] and to the Audit Committee on:

- The Firm's risk management control environment, including: the establishment, review, and compliance with limits; staffing; independence of the risk function; and the adequacy of reporting structures.

- ***Any material issues regarding risk management raised by internal audit reports rated less than satisfactory or by regulatory reports identifying issues as matters requiring attention.***

---

[1]    Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

- Other matters as required by law, regulation, or agreement.

30.     The committee must also "ensure that there is in place an effective system of controls reasonably designed to evaluate and control risk," which includes reviewing "firmwide value-at-risk and stress limits" as well as "such other key metrics agreed to with management and performance against such metrics."

31.     The committee must also manage risks effectively, which requires the members to meet with the "Chief Risk Officer and the Chief Risk Officers for each line of business" to discuss "any concerns that they believe could reasonably be material to the Firm or to a line of business."

32.     The Risk Committee also oversees reputational risks within its scope of responsibility.

### C.     Audit Committee

33.     The Company, like most companies, also has an audit committee which is charged with, among other things, overseeing the Company's internal audit function and assuring that there is an effective system of controls to: a) safeguard the assets of the Company; b) assure the integrity of the financial statements; and c) maintain compliance with the Company's ethical standards, policies, plans and procedures as well as with law and regulations.

34.     In addition, the Audit Committee is charged with overseeing reputational risks and conduct risks within the scope of its responsibilities.

### D.     Corporate Governance Committee

35.      The Board also has a Corporate Governance Committee which is charged with among many things to evaluate and recommend to the Board corporate governance measures and appraise the framework and assessment of Board performance and the Board's self-evaluation.

36.     In addition, the Corporate Governance Committee oversees reputational risks within its scope of responsibility.

### E. Compensation & Management Development Committee

37.     The  Board also has Compensation & Management Development Committee, which is charged with among other things, overseeing the Company's culture, including reviewing updates from management regarding significant conduct issues and any related employee actions.

38.     In addition, the Compensation & Management Development Committee oversees reputational risks and conduct risks within the scope of its responsibilities.

## V.     SUBSTANTIVE ALLEGATIONS

### A. Background: Precious Metals Desk

39.     JPMorgan is a financial holding company organized into four business segments: (1) Consumer & Community Banking ("CCB"), (2) Corporate & Investment Bank ("CIB"), (3) Commercial Banking ("CB"), and (4) Asset and Wealth Management ("AWM").  Commodities trading in precious metals is a part of the CIB and was conducted at JPMorgan by individuals at the Precious Metals Desk.

40.     At all relevant times, JPMorgan operated one of the largest precious metals trading desks in the world with offices in New York, London, and Singapore that operated as a single, cohesive global desk (the "Precious Metals Desk"). The precious metals trading operation generates nearly $250 million in annual profit.

41.     Precious metals traders use an electronic trading system called "Globex" to buy and sell gold and silver futures on the Commodities Exchange, Inc. ("COMEX") and platinum and palladium futures on the New York Mercantile Exchange, Inc. ("NYMEX"). Traders place orders through Globex by making "bids" to buy or "offers" to sell, which are executed when they are matched with a correspondingly priced offer or bid.

42.     COMEX and NYMEX also allow traders to make "iceberg orders," which are not entirely visible to other public participants. Instead, only a pre-set portion is visible at any given

time; once it is filled, the next pre-set portion becomes visible. This process repeats until the entire iceberg is executed or is cancelled.

43.     The Precious Metals Desk also traded options contracts in precious metals, including "barrier" options whose value depends on whether or not the underlying asset reaches or exceeds a pre-determined price during the lifetime of the option.

44.     In contrast to the historic commodities trading done on a physical trading floor, Globex allowed traders to use proprietary algorithmic trading based on mathematical formulas incorporating market information to place orders at extraordinary speeds, as many as hundreds of orders within a single second. The speed at which algorithms executed orders prevented manual traders from completing deals, as algorithmic traders could complete them faster, creating market momentum that pushed prices away from the manual traders' targets.

**B.      JPMorgan's Internal Controls and Procedures for Transaction Surveillance**

**1.      The Company Purportedly Enhanced its Internal Controls In Connection With Prior Criminal Activity**

45.     During defendant Dimon's tenure, JPMorgan has admitted to engaging in various criminal activities, each of which represents a red flag for the Board's oversight of the Company's risk and compliance functions. The illegal spoofing in the precious metals market is the latest instance of such criminal financial activity. In connection with these prior criminal proceedings, JPMorgan was required to implement certain remedial changes to its compliance program.

46.     On November 19, 2013, JPMorgan settled with the DOJ for $13 billion to resolve federal and state civil claims related to the marketing and sale of residential mortgage-backed securities between 2005 and 2008. This was "the largest settlement with a single entity in American history[.]"

47.    On January 7, 2014, JPMorgan entered into a deferred prosecution agreement with the DOJ in connection with two felony violations of the Bank Secrecy Act related to the Company's relationship with Bernard L. Madoff Investment Securities. In addition to a $1.7 billion penalty, JPMorgan was required to implement significant remedial changes to its compliance program, including submitting quarterly reports to the DOJ for two years describing the status of the remedial changes.

48.    In a letter to shareholders issued three months after entering the agreement, defendant Dimon detailed JPMorgan's $600 million investment in its regulatory and compliance program, stating that "13,000 employees will have been added since the beginning of 2012 through the end of 2014 to support [the Company's] regulatory, compliance and control effort." ***Moreover, the Company spent more than $2 billion between 2012 and 2014 to improve its controls***. Notably, this investment included "a state-of-the-art control room in [JPMorgan's] corporate headquarters to provide streamlined data analysis and reporting capabilities of control and operational risk data across the firm."

49.    In his April 2015 letter to shareholders, defendant Dimon stated that JPMorgan had "strengthened compliance" by adding "approximately 8,000 people across the firm with a mission to strengthen [its] compliance capabilities." Its risk functions had been centralized to "improve the consistency of controls" and the compliance function was "given huge amounts of additional authority . . . at our corporate headquarters."

50.    On May 20, 2015, JPMorgan pleaded guilty to a felony charge of conspiring to manipulate the price of monies in the foreign currency exchange ("FX") spot market and paid a $550 million fine. Specifically, JPMorgan admitted that its euro-dollar traders used an exclusive

electronic chat room and coded language to manipulate FX rates to eliminate competition in the purchase and sale of the euro-dollar currency pair.

51.     As part of the plea in 2015, the Company agreed to a three-year corporate probation which required enhancing its internal controls and procedures. Specifically, the CFTC required JPMorgan to enhance its internal controls and procedures related to: (i) measures to enhance detection and deterrence of trader misconduct; (ii) monitoring systems designed to enhance the detection and deterrence of manipulative trading; and (iii) enhanced supervision of trading desks. Though the plea was signed in May 2015, it was not judicially approved until January 2017. Thus, the corporate probationary period ran from January 2017 to 2020, during which time JPMorgan was required to report to the DOJ all instances of fraud, including illegal spoofing. The Board formed an FX / Markets Compliance Committee ("Compliance Committee") to oversee compliance with any remediation required by the plea. According to a letter to the SEC, the Company stated that the Board developed an "action plan to meet these regulatory commitments," which focused on "the following five areas: (1) supervision, controls, and governance, (2) compliance risk assessment, (3) compliance monitoring and surveillance, (4) compliance testing and (5) internal audit."

52.     In a letter to shareholders issued on April 6, 2016, defendant Dimon touted that JPMorgan's "intense efforts … are now yielding real results that will protect the company in the future," stating in relevant part:

> ***We have reinforced a culture of accountability for assuming risk*** and have come a long way in self-identifying and fixing shortcomings. Many new permanent organizational structures have been put in place to ensure constant review and continuous improvement. For example, we now have a permanent Oversight & Control Group. The group is charged with enhancing the firm's control environment by looking within and across the lines of business and corporate functions to identify and remediate control issues. This function enables us to detect control problems more quickly, escalate issues promptly and engage other

stakeholders to understand common themes across the firm. We have strengthened the Audit Department and risk assessment throughout the firm, enhanced data quality and controls, and also strengthened permanent standing committees that review new clients, new products and all reputational issues.

**The effort is enormous.**

Since 2011, our total headcount directly associated with Controls has gone from 24,000 people to 43,000 people, and our total annual Controls spend has gone from $6 billion to approximately $9 billion annually over that same time period. We have more work to do, but a strong and permanent foundation is in place.

53.     By early 2016, JPMorgan had overhauled its compliance function, including with a dedicated Oversight & Control Group that was "charged with enhancing the firm's control environment by looking within and across the lines of business and corporate functions to identify and remediate control issues." According to the 2016 letter to shareholders, this "function enables [the Company] to detect control problems more quickly, escalate issues promptly and engage other stakeholders to understand common themes across the firm."

        **2.**    **While Monitoring Controls Implemented in Response to the FX Orders,** ███████████████████████████
███████████████████████████

54.    ███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

55.    ███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

56.



57. ██████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████

58. ██████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████

59.  ████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
███████████

60.  ████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████

61.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

62.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

63.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████



64.

65.

66.

**C.    JPMorgan's Traders Engaged in Illegal Spoofing, Causing the Company to Incur a $920 Million Fine**

**1.    The Individual Defendants Have Been on Notice of Spoofing Allegations Since 2008**

67.    In September 2020, JPMorgan entered a deferred prosecution agreement with the

DOJ, including admitting that from at least March 2008 to August 2016 traders on the Precious

Metals Desk engaged in an unlawful spoofing scheme (the "DOJ DPA"). Spoofing enabled manual

traders at the Precious Metals Desk to undermine the algorithmic traders by placing orders, never intending to complete them, that would distort the supply and demand inputs for the algorithms.

68. However, even prior to entering the DOJ DPA, the Individual Defendants had reason to know of the illegal spoofing scheme because several of the Company's traders at the Precious Metals Desk pled guilty to their participation. ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ In November 2018, John Edmonds, a former JPMorgan employee, pleaded guilty to one count of commodities fraud and one count of engaging in a spoofing conspiracy. ████████████████████████

████████████████████████████████████████████████████████

████████████████████████ In August 2019, Christian Trunz ("Trunz") pleaded guilty to one count of conspiracy to engage in spoofing and one count of spoofing. In September 2019, the DOJ filed an indictment against Michael Nowak and Gregg Smith (and later adding Jeffrey Ruffo) charging them with a RICO conspiracy scheme of spoofing; trial began in July 2022. ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

69. JPMorgan has been investigated three times since 2004 for commodities market manipulation. Most recently, in 2008, the CFTC investigated misconduct in the silver market for futures contracts on COMEX, following hundreds of complaints from retail investors alleging market manipulation. According to news reports, JPMorgan was the center of this investigation,

as CFTC lawyers interviewed employees in its metal-trading business, industry traders, and commodity executives. By October 2010, the CFTC Commissioner had determined that there were "repeated attempts to influence prices in the silver markets" which were violations of the Commodity Exchange Act.

70.     Though the CFTC investigation concluded without any recommendation of charges, the DOJ has since confirmed that that had "centered on conduct that is at the core of this criminal case – the entry of futures orders without the intent to execute."

71.     That is, the CFTC investigation which began in 2008 focuses on the same spoofing misconduct that became the subject of the $920 million fine imposed in September 2020. The difference is merely the agency's technological tools to analyze the available data. According to the CFTC's enforcement director, James McDonald: "Twelve years ago, we were just conducting those types of investigations differently. We were relying on statements presented to us either from the entity itself or the traders in sworn testimony. We didn't have the same ability to look beneath them to ensure they were truthful and accurate."

72.     The spoofing misconduct was also the subject of multiple investor lawsuits. In 2011, retail investors who transacted in silver futures contracts on COMEX sued JPMorgan for market manipulation. Though the case was ultimately dismissed, JPMorgan admitted in a declaration that the Company "produced more than 720,000 pages of documents to the CFTC" in connection with its investigation, thereby acknowledging that it had reviewed and produced relevant documents between 2008 and 2013 related to market manipulation of the silver futures markets.

73.     In 2015, another precious metals trader sued JPMorgan alleging it had "manipulated the prices of silver futures spreads to its advantage" by "plac[ing] artificial,

unrealistic bids on the trading floor." The lower court's dismissal was reversed by the Second Circuit, and the case proceeded to discovery. Throughout 2017 and 2018, JPMorgan made substantial document productions, thereby acknowledging that it had reviewed and produced relevant documents between 2010 and 2011 related to market manipulation of the silver futures markets. Following the guilty pleas of certain of the Company's precious metals traders, the case settled for an undisclosed amount in August 2020.

74.    In 2020, another investor class action was filed against JPMorgan for market manipulation of Treasury futures contracts and options on U.S. Treasury futures contracts, which was also the subject of the later DOJ DPA. The Company settled the claims for $15.7 million, which was finally approved in June 2022.

### 2.    No Controls Existed for Spoofing Until 2014 at the Earliest

75.    ███████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████

76.    ███████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████

77.    ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████

78.    ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

79.    ███████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

80.     The timing suggests that these changes were a result of the FX plea in 2015. According to a letter to the SEC dated May 2015 detailing the FX plea,[2] the Company had already made "progress" to remediate its controls and procedures. As to market manipulation, JPMorgan "exited participation in certain submission-based FX benchmarks" and "executes orders at the WM/Reuters fix for twenty-one currency pairs via an automated algorithm." Such automation purportedly "limited visibility into orders." Moreover, JPMorgan "created a 2015 CIB Compliance Testing plan which includes tests specifically focused on the detection or prevention of employee market misconduct controls and processes in the FX business." As to e-communications, the

---

[2]     https://www.sec.gov/divisions/corpfin/cf-noaction/2015/jpmorgan-chase-052015-405.pdf

Company "limited the use of electronic chats and instant messaging groups," "expanded electronic communication surveillance to additional channels," and "established a process whereby it reviews its electronic communication lexicons and transaction surveillance scenarios and makes enhancements, as appropriate, at least annually."

**3.** ███████████████████████████████████

81. ███████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
██████████████████████████████████

82. ███████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

83.

84.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

**D.      The Individual Defendants Caused JPMorgan to Issue Materially Misleading Statements**

85.      On February 23, 2016, the Individual Defendants caused JPMorgan to file a Form 10-K with the SEC for the period ended December 31, 2015 (the "2015 10-K"). The 2015 Form 10-K states: "In the physical commodity markets, the Firm primarily purchases and sells precious and base metals and may hold other commodities inventories under financing and other arrangements with clients." These physical commodities were "[v]alued using observable market prices or data."

86.      These statements were substantially repeated in the Company's Forms 10-K for fiscal 2016 through fiscal 2019. Dimon signed each of these 10-Ks.  Lake signed the 2016-2018 10-Ks.

87.      These statements were materially misleading because, when stating that physical commodities were valued "using observable market prices or data," the Individual Defendants had a duty to disclose that those observable market prices were manipulated by spoofing by JPMorgan's traders and that these practices risked regulatory scrutiny, civil penalties, and reputational harm.

**E.      JPMorgan Pays the Largest Fine to Date to Resolve Spoofing Charges**

88.      On September 29, 2020, the DOJ, CFTC, and SEC each announced charges against JPMorgan for spoofing the trading of securities. In addition to restitution and disgorgement,

JPMorgan was ordered to pay $920 million in penalties, which accounts for 85% of all fines paid by any bank for spoofing charges, according to an article by *The Wall Street Journal*.

89.     The DOJ announced that JPMorgan had entered into the DOJ DPA, agreeing to pay $920 million, which includes $311,737,008 in restitution, $172,034,790 in disgorgement, and $436,431,811 in a civil monetary penalty, to avoid criminal prosecution for spoofing by the Precious Metals Desk between March 2008 and August 2016 as well as spoofing of U.S. Treasury futures contracts from April 2008 to January 2016. The SEC charged JPMorgan for manipulative trading of U.S. Treasury securities, for which the Company was ordered to pay $10 million in disgorgement and $25 million as a civil penalty. This penalty offset the criminal penalties imposed by the DOJ.

90.     In the Statement of Facts as part of the DOJ DPA (the "DOJ SOF"), JPMorgan admitted that multiple traders of the Precious Metals Desk "knowingly and intentionally placed orders to buy and sell precious metals futures contracts with the intent to cancel those orders before execution" to deceive market participants about "the existence of genuine supply and demand for precious metals futures contracts." DOJ SOF, ¶19.

91.     Moreover, they also placed orders they intended to execute, which "[s]ometimes, but not always, . . . were iceberg orders, so that other market participants could see only a portion of the order's full size at any given time." *Id.* at ¶20.

92.     Though this unlawful trading occurred "[e]ven prior to May 2008," new tactics were used after JPMorgan acquired Bear Stearns when Smith and Trunz joined the Company. *Id.* at ¶¶23-24. They brought "a new style of unlawful trading which involved layering multiple Deceptive PM Orders at different prices in rapid succession that in the aggregate, if not individually, were substantially larger than the visible portion of the opposite-side Genuine PM

Order." *Id.* at ¶24. This style was called layering and it "was more difficult both to execute and to detect than placing a single, large Deceptive PM Order[.]" *Id.*

93.     These unlawful practices were intended to, and did, "deceive other participants in those markets into believing something untrue, namely that the visible order book accurately reflected market-based forces of supply and demand." *Id.* at ¶25. Those participants then "react[ed] to the apparent change and imbalance in supply and demand by buying and selling precious metals futures contracts at quantities, prices, and times that they otherwise likely would not have traded." *Id.* at ¶26. Specifically, JPMorgan's traders engaged in this conduct "with the intent to fraudulently and artificially move the price of a given precious metals futures contract in a manner that would increase the likelihood that one or more of their own opposite-side Genuine PM Orders would be filled by other market participants" to generate profits and avoid losses for the Precious Metals Desk. *Id.* at ¶29.

94.     These tens of thousands of trading sequences resulted in "at least $200,847,102 in losses to other participants in the markets for precious metals futures contracts." *Id.* at ¶ 32. The scheme was also undertaken to deliberately trigger or defend barrier options held by JPMorgan, allowing the Company to "avoid losses of at least $5,145,000." *Id.* at ¶¶ 46-53.

95.     According to the CFTC's order, "[t]his scheme benefitted JPM financially in the amount of $172,034,790 while also inflicting harm on the markets and other market participants, resulting in $311,737,008 in market losses." It also found that, in connection with the CFTC's earlier investigation of spoofing, JPMorgan failed to timely produce certain documents, "responded incompletely or unsatisfactorily to certain of the Division's information requests in a manner that resulted in the Division being misled, and failed to timely inform the Division of relevant information."

96. Though the Company's compliance manual prohibited spoofing, JPMorgan was also required to surveil for potential market manipulation. The CFTC found that the Company "failed to perform its supervisory duties diligently." Specifically, "despite numerous red flags, including internal surveillance alerts, inquiries from CME and the Commission, and internal allegations of misconduct from a JPM trader, [the Company] still failed to provide supervision to its employees sufficient to enable JPMS to identify, adequately investigate, and put a stop to JPM's Precious Metals Desk and Treasuries Desk's misconduct."

97. As JPMorgan admitted in the DOJ DPA, its traders "discussed their unlawful activity with each other using electronic communications such as 'chats' and emails." DOJ DPA, ¶¶ 46-53. These trades were discussed not only among the traders of the Precious Metals Desk, but also JPMorgan's other employees. For example, the DOJ DPA states:

> On February 24, 2009, at 8:39:24 a.m., Trunz alerted a salesperson on the Precious Metals Desk in London via chat to the fact that Smith was placing Deceptive PM Orders:

> Trunz: so you know its gregg [Smith] bidding up on the futures trying to get some off

> Salesperson 1: sweet mate

> Trunz: incase you were watching some large bids come into market

> Salesperson 1: appreesh // that worked !

> Trunz: haha

> Approximately contemporaneous with this conversation, Smith was engaged in trading activity that involved placing multiple Deceptive PM Orders to buy (*i.e.*, "bidding up"). For example, at 8:35:35.110 a.m., Smith placed a Genuine PM Order to sell seven gold futures contracts at $988.90. Next, 47.195 seconds later, beginning at 8:36:22.305 a.m., Smith placed 11 layered Deceptive PM Orders to buy seven contracts each (77 contracts total) from $988.60 to $988.80 with the intent to create the illusion of demand, deceive other market participants, and artificially move the market price higher. Then, 1.203 seconds later, beginning at 8:36:23.508 a.m., three of the seven contracts in Smith's Genuine PM Order were

filled. Last, 957 milliseconds later, beginning at 8:36:24.465 a.m., Smith canceled his Deceptive PM Orders in their entirety.

98.     Thus, even if the Company could not detect spoofing in real time, the chat records could be used to identify and prevent further unlawful trading. As a *Bloomberg* article noted, "whereas one big order might stand out, a lot of small ones [used in layering] might not. That made it important to warn colleagues when layering was in progress."

**F.     The Board's Response to the Credible Spoofing Allegations**

99.     ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████████████████████████████.

100.    ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████

101.   ██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

102.   ██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

103.   ██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



104.

105.

106.   Nevertheless, these measures fall short. For example, as the DOJ DPA recognizes, "suspensions of employees on the precious metals desk occurred several months after the Fraud

Section and the Office notified the Company of their investigation and only *after* a second individual involved in the precious metals conduct had pleaded guilty." DOJ DPA, ¶ 4(d).

## VI.   DAMAGES TO THE COMPANY

107.   As a direct and proximate result of the Individual Defendants' conduct, JPMorgan has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

(a)   Costs incurred from compensation and benefits paid to the defendants who have breached their duties to JPMorgan;

(b)   $920 million in sums paid to resolve the precious metals investigations;

(c)   Legal fees paid in connection with the Securities Class Action; and

(d)   Any funds paid to settle the Securities Class Action.

108.   In addition, JPMorgan's business, goodwill, and reputation with its business partners, regulators, and shareholders has been gravely impaired. The Company still has not fully admitted the nature of its false statements and the true condition of its business. The credibility and motives of management are now in serious doubt.

109.   The actions complained of herein have irreparably damaged JPMorgan's corporate image and goodwill. For at least the foreseeable future, JPMorgan will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and misled the investing public, such that JPMorgan's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VII.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

110.   Plaintiff brings this action derivatively in the right and for the benefit of JPMorgan to redress injuries suffered, and to be suffered, by JPMorgan as a direct result of the wrongdoing alleged herein. JPMorgan is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

111.    Plaintiff will adequately and fairly represent the interests of JPMorgan in enforcing and prosecuting its rights.

112.    Plaintiff has continuously been a shareholder of JPMorgan at times relevant to the wrongdoing complained of and is a current JPMorgan shareholder.

113.    When this action was filed, JPMorgan's Board of Directors consisted of eleven directors: defendants Dimon, Bammann, Burke, Combs, Crown, Flynn, Hobson, and Neal and non-party directors Gorsky, Novakovic, and Rometty. Plaintiff did not make a demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

114.    Notwithstanding the substantial remuneration received by the directors for their membership on the board and committees thereof, the directors breached their fiduciary duties to the Company and its stockholders. A majority of the Board faces a substantial likelihood of liability for their failure to implement requisite controls to detect spoofing transactions despite being on notice of red flags. Given the pedigree of these directors, these red flags should not have gone unnoticed.

115.    In addition, a majority of the board members have been on the board or have been members of the Risk, Audit, Compensation, Corporate Governance Committees all of which had overlapping responsibilities during Dimon's tenure which faced an avalanche of governmental investigations.

116.    ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

117.    Moreover, the ***entire Board*** was on notice that JPMorgan had been investigated several times since 2004 for commodities market manipulation and specifically in 2008 for misconduct in the silver market for futures contracts. As the DOJ later confirmed, the misconduct that was the subject of the 2008 investigation "centered on conduct that is at the core of this criminal case," *i.e.*, they were the same.

118.    In spite of this notice and the clear risk of regulatory scrutiny and reputational harm, a majority of the Board failed to ensure JPMorgan's controls with respect to transaction surveillance were effective. ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████ This is critical because the precious metals traders used various e-communication channels in furtherance of their market manipulation, as alleged in the Statement of Facts to the DOJ DPA. ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████

119.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

120.    The utter failure to implement requisite controls as set forth herein could not have been in good faith, excusing demand as to defendants Dimon, Bammann, Burke, Combs, Crown, Flynn, Hobson, and Neal.

<u>**COUNT I**</u>

**Against the Individual Defendants for Breach of Fiduciary Duty**

121.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

122.    The Individual Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of JPMorgan's business and affairs, particularly with respect to issues as fundamental as the accuracy of its publicly reported financial information.

123.    The conduct of the Individual Defendants set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  The Individual Defendants intentionally or recklessly breached their fiduciary duties to protect the rights and interests of JPMorgan.

124.    In particular, the Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to contain materially untrue statements.

125.    As a direct and proximate result of these breaches of their fiduciary obligations, JPMorgan has sustained and continues to sustain significant damages, including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital

markets.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT II

**(Against Defendants Dimon and Lake for Contribution
For Violations of Sections 10(b) and 21D of the Exchange Act)**

126.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

127.   The conduct of Defendants Diamond and Lake, as described herein, has exposed the Company to significant liability under various federal and state securities laws by their disloyal acts.

128.   JPMorgan is named as a defendant in related securities fraud lawsuit that allege and assert claims arising under § 10(b) of the Exchange Act. The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein. If JPMorgan is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts. The Company is entitled to contribution and indemnification from these Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

129.   As officers, directors and otherwise, Defendants Dimon and Lake had the power or ability to, and did, control or influence, either directly or indirectly, JPMorgan's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated § 10(b) of the Exchange Act and SEC Rule 10b-5.

130.     Defendants Dimon and Lake are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

131.     Defendants Dimon and Lake have damaged the Company and are liable to the Company for contribution.

132.     No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff, on behalf of JPMorgan, demands judgment as follows:

A.      Declaring that plaintiff may maintain this action on behalf of JPMorgan and that plaintiff is an adequate representative of the Company;

B.      Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties;

C.      Directing JPMorgan to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect JPMorgan and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a proposal to strengthen the Company's controls over financial reporting;

2.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.      a proposal to strengthen JPMorgan's oversight of its disclosure procedures;

4.      a provision to control insider transactions; and

5.      a provision to permit the stockholders of JPMorgan to nominate at least three candidates for election to the Board;

D.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of JPMorgan has an effective remedy;

E.      Awarding to JPMorgan restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants including renumeration for compensation as directors;

F.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

Dated: December 16, 2022

                                   /s/ Benjamin I. Sachs-Michaels
                                   **GLANCY PRONGAY & MURRAY LLP**
                                   Benjamin I. Sachs-Michaels
                                   Daniella Quitt
                                   745 Fifth Avenue, Fifth Floor
                                   New York, New York 10151
                                   Telephone: (212) 935-7400
                                   bsachsmichaels@glancylaw.com
                                   Dquitt@glancylaw.com

                                   Robert V. Prongay
                                   Pavithra Rajesh
                                   1925 Century Park East, Suite 2100
                                   Los Angeles, California 90067
                                   Telephone: (310) 201-9150

                                   *Counsel for Plaintiff*

807161.3                               40

**LAW OFFICE OF ALFRED G. YATES, JR.**
Alfred G. Yates, Jr.
1575 McFarland Road, Suite 305
Pittsburgh, Pennsylvania 15216
Telephone: (412) 391-5164

*Additional Counsel*

## JPMORGAN CHASE & CO. VERIFICATION

I, Charles R. Blackburn, do hereby verify that I am a holder of common stock of JPMorgan Chase & Co. and was a holder of such common stock at the time of the wrongs complained of in the foregoing Verified Stockholder Derivative Complaint (the "Complaint"). I have reviewed and authorized the filing of the Complaint. All of the averments contained in the Complaint regarding me are true and correct upon my personal knowledge, and with respect to the remainder of the averments, are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

December 12, 2022

Charles R. Blackburn